## WOODS *vs.* SPALDING and others.

The right of priority of sale in a foreclosure suit, where the mortgaged premises have been sold subsequent to the mortgage, does not depend upon warranty. But it arises out of the application of equitable principles under which the rights and obligations of sureties are ascertained.

Where those equities are equal, as they are between the purchasers of different portions of the premises covered by the mortgage, he who is prior in time is deemed prior in right. Hence the premises alienated are required to be sold, to satisfy the common incumbrance, in the inverse order of alienation.

This rule is applied not only to determine the equitable position of those who have acquired the legal title, but also for the purpose of protecting the interests of incumbrancers, whether by mortgage or judgment.

Where different portions of the mortgaged premises have been sold under judgments, those portions are to stand, in the order of sale in a foreclosure suit, as of the times when the judgments respectively became liens, and not as of the times when conveyances therefor were executed by the sheriff.

The protection afforded by equity to different purchasers of portions of the mortgaged premises can not be extended beyond the period when the judgments under which they purchased became liens upon the land.

THIS action was brought to foreclose a mortgage, made and executed by the defendant Alexander Pound to secure a portion of the purchase price of the premises described therein. The defendant Pound derived his title through a foreclosure sale made upon the foreclosure of a mortgage previously given upon the premises by Lyman A. Spalding, another of the defendants in this action. And the referee to whom it was referred to settle and declare the order in which the premises should be sold, reports that when the defendant Pound acquired his title, it was done under an arrangement between himself and the defendant Spalding, wherein it

Woods *v.* Spalding.

was agreed that Pound should take and hold the title to the premises for the benefit of and in trust for Spalding, and should deed and convey the same at such time and in such parcels as he should direct. And that Spalding took possession of the premises and used and occupied them, and from time to time sold them in small parcels, until nearly all the mortgaged premises were sold and conveyed. The sales were usually made by contracts in Spalding's name. At first, Pound conveyed the parcels sold, by warranty deed, to the purchasers, but afterwards, in fulfillment of the contracts made by Spalding, the parcels sold were conveyed by Pound by quit-claim deed; and Spalding also executed and delivered warranty deeds for them. On the 26th day of February, 1844, the defendant Pound, together with his wife, conveyed lot known as No. 100, on High street, in the village of Lockport, being part of the premises covered by the mortgage, to Daniel F. Kline, who conveyed the same to Alphonso B. Hall, on the 17th of December, 1847. And he, on the 8th of June, 1848, conveyed the same lot to the defendant Lyman A. Spalding, who continued to own it under that conveyance until the 15th of November, 1852. On the 20th of June, 1850, a judgment was recovered in this court, against Spalding, which was duly docketed in the office of the clerk of Niagara county. And on the 27th of September, 1851, another judgment was recovered against him in this court, which was also docketed in the Niagara county clerk's office. And on the 24th of September, 1861, lot No. 100, on High street, was sold under the last mentioned judgment. And after the time of redemption had expired, the sheriff conveyed that lot to Philip Freeman in pursuance of the sale made under the judgment. On the 30th day of March, 1854, the defendant Pound, together with his wife, by quit-claim deed, conveyed to the defendant Spalding all of the mortgaged premises then remaining unsold. And on the 11th day of June, 1860, the sheriff of Niagara county, under the judgment recovered on the 20th of June, 1850, sold lots 108 and

110, on Washburn street, and 117 on Price street, in said village of Lockport, which lots were included in and conveyed by the quit-claim deed to Spalding. These lots were conveyed by such sheriff to Philip Freeman, in pursuance of the sale, on the 21st of September, 1861.

In declaring the order of sale in this suit, the referee directed these lots to be sold as of the dates of the respective judgments against Spalding, under which they were sold. And the court at special term confirmed the report in that particular, as well as in reference to the other notices contained in it. The defendants, whose premises were affected by this determination, excepted to the report of the referee, and to the decision of the court by which it was confirmed, and after judgment, appealed to the general term.

*H. Gardner* and *T. M. Webster*, for the appellants.

*L. F. Bowen*, for the respondent.

*By the Court,* DANIELS, J.  From the manner in which Alexander Pound, the mortgagor, acquired and held the title to the premises in question, it is evident that so much of them as were afterwards conveyed to the defendant Lyman A. Spalding, continued, while in his hands, to be the primary fund, for the payment of the mortgage debt. While the understanding and agreement respecting them was observed by Pound, Spalding was their beneficial owner, and the debt contracted for their purchase, though nominally the debt of the former, was still, as between themselves, in reality the debt of the latter. It is true that the rights of Spalding in the land, if the agreement was unwritten, could not have been protected or enforced either in law or equity, if Pound were disposed to resist proceedings instituted for that object. But as long as he was disposed to perform, and did perform, the understanding, there will be no impropriety in considering the transaction the same as though he had been legally bound

to do so.  And in that view, the conveyance to Pound, and the mortgage from him to secure the purchase money, must be regarded in the same manner that they would have been if Spalding had nominally stood in Pound's place, for the purpose of determining the equitable rights of purchasers of portions of the mortgaged premises.

Besides the circumstance that the property, by the agreement between himself and Pound, was purchased, held and sold, and the debt created for his benefit, many parcels of it had been conveyed with his warranty, which in those cases placed the obligation personally upon him of securing the extinguishment of the mortgage.

It could not, therefore, with any propriety be claimed that lot No. 100 on High street, which Pound conveyed to Kline, and which by his grantee was conveyed to Spalding, should be placed in the order of sale of the date of the conveyance of it by Pound.  For when it reached Spalding it became again part of the land primarily liable for the payment of the mortgage, in the same manner as it would if the conveyance had been directly to Pound.   This lot, therefore, should not take its place in the order of sale at any time before the judgment became a lien upon it, under which it was sold, which was on the 27th of September, 1851.   It can make no difference whatever that it was then subject to the lien of an earlier judgment; because that lien never was enforced, but was lost by lapse of time.

The preceding judgment also became a lien upon lots 108 and 110 on Washburn street, and 117 on Price street.   But as these lots were not conveyed to Spalding, the judgment debtor, until the 30th day of March, 1854, the judgment could not become a lien upon them prior to that date.   The interest which he had in the property before that time, even if it could have been enforced, was only an equity, and under the provisions of the statutes of this state, enured as such for the benefit of the judgment creditor.   It was not such

an interest as could be made the subject of a lien by judgment. (*Garfield* v. *Hatmaker*, 15 *N. Y. Rep.* 475.)

Even if the power existed, of constructively extending the lien of the judgment upon those three lots back to the time when it was recovered, it would be very improper to exercise it, because other persons had acquired titles to portions of the mortgaged premises from Pound between the recovery of the judgment and the conveyance of these lots to Spalding. They, as well as the preceding purchasers, were entitled to insist that all of the mortgaged premises remaining in Pound, at the date of their respective conveyances, should be devoted to the payment of the mortgage debt, as the primary fund for that purpose. And when Spalding became seised of these lots, his seisin was subject to these preceding equities. And the judgment lien, when it attached, was subject to such equities, because it could only extend to Spalding's right, title and interest in the premises. And judgments are bound by particular equities. (*Moyer* v. *Hinman*, 3 *Kern.* 180.) And whenever a sale is made under the judgment, the interest conveyed is simply the title and interest which the judgment debtor had in the land when it took effect as a lien. If, therefore, the purchaser of the lots under the judgment can be regarded as having such an interest in them, at any time before the title is conveyed, as will bring them within the protection afforded by equity to different purchasers of portions of the mortgaged property, that protection can not be extended beyond the period when the judgment became a lien upon them.

If the lien itself is not entitled to the protection of the court, it follows that the mere sale of the property under the judgment will not change the case, for that has no other effect at the time than that of changing into a specific, what before was but a general lien. The time to apply this principle, if applied at all, in such cases, is either when the judgment takes effect as a lien upon the land, or when the title is conveyed by the sheriff, in pursuance of the sale. In this

case, it is insisted that it should not be applied at all. And the propriety of its exclusion is endeavored to be maintained under the rule which regards the purchaser of the equity of redemption at a sale made under a junior incumbrance, as holding the property subject to, and as the primary fund for, the payment of preceding incumbrances. This rule proceeds upon the presumption that the purchaser in a case like that, bid for the property only what he deemed to be its value, subject to the prior incumbrances upon it. It has never been applied to a case like the present one, for the purpose of defeating the equitable priority of a · creditor whose lien was created either by mortgage or judgment. But the application made of it has been in those cases where it became necessary to secure the appropriation of the mortgaged property to the payment of the mortgage debt, in exoneration of the personal liability of the mortgagor upon his bond. As between the purchaser who has presumed to buy the land for what he regarded as the value of the equity of redemption merely, and the debtor upon the bond, the land was justly held to be the primary fund for the payment of the debt. To that extent this rule has been carried against a purchaser under a subsequent incumbrance, whether by mortgage or judgment. And such will be found to be the character of the authorities supporting it. (*Tice* v. *Annin*, 2 *John. Ch.* 125. *Heyer* v. *Pruyn*, 7 *Paige*, 465. *Cox* v. *Wheeler*, *id.* 248. *Russell* v. *Allen*, 10 *id.* 249. *McKinstry* v. *Curtis*, *Id.* 503. *Mathews* v. *Aikin*, 1 *Comst.* 595.) If this rule should be extended to the determination of the order of sale under the foreclosure of a mortgage, it would prevent the application of the principle of equitable priority in favor of incumbrancers, altogether, and would in many cases, result in great injustice. For if the title acquired under a sale made to satisfy the subsequent incumbrance is not entitled to protection, certainly there would be no object left for protecting the lien of the incumbrance merely. No

benefit or advantage could be secured in that manner to the creditor.

As this case can not properly be disposed of under the operation of that principle, the question remains to be considered whether the interest which the purchaser acquired in the premises at the time of the conveyance by the sheriff, or that secured when the judgment became a lien, is to determine the order of priority in which the sale shall be made in this action. The right of priority of sale, where the mortgaged premises have been sold subsequent to the mortgage, does not depend upon warranty. But it arises out of the application of equitable principles under which the rights and obligations of sureties are ascertained. Where those equities are equal, as they are between the purchasers of different portions of the premises covered by the mortgage, he who is prior in time is deemed prior in right. And accordingly the premises alienated are required to be sold to satisfy the common incumbrance in the inverse order of alienation. This rule is applied, not only to determine the equitable position of those who have acquired the legal title, but also for the purpose of protecting the interests of incumbrancers, whether by mortgage or judgment. Equity regards the fact of interest, not the peculiar quality or description of it, as the subject of its interposition and protection. (*Guion* v. *Knapp,* 6 *Paige,* 35, 42. *Skeel* v. *Spraker,* 8 *id.* 182, 195. *Kellogg* v. *Rand,* 11 *id.* 59.) In the last case, the Chancellor held that a subsequent mortgage was an alienation, to the extent of the money due upon it, and for which the junior mortgagee had no other security, which should in equity be first resorted to. (*Id.* 64.) And the principle was declared to apply to all incumbrances upon different portions of the property subsequent to the mortgage under foreclosure, in the case of *The New York Life Insurance Company* v. *Milnor,* (1 *Barb. Ch.* 353, 363 ;) and whether by judgment or mortgage, in the case of *Stuyvesant* v. *Hall,* (2 *id.* 151, 155.)

---

Woods *v.* Spalding.

---

Under the application of this equitable principle, it is manifest, the lots in question must stand in the order of sale, as of the times when the judgments under which they were sold became a lien, which will postpone the lots on Washburn street, numbered 108 and 110, and lot 117 on Price street, to the 30th of March, 1854, when the judgment under which they were sold, first became a lien upon them. This will place them as number twenty-eight and one half in the order of alienation, instead of twenty-two and one half as designated by the referee.

As the facts are all found, by the referee in his report, affecting the order in which these premises should be sold, there will be no necessity of sending the case back to the referee. The correction can be properly made by the modification of the judgment in such a manner as to direct the order of sale in conformity with the conclusion already adopted. (*Beach* v. *Cooke,* 28 *N. Y. Rep.* 508.)

The objection that the referee has not provided, by his report, for the order in which the residue of lot 104 on Washburn street should be sold, would seem, from his report, to be a misapprehension. This will be found to have been provided for by number twenty-four in the order of alienation. As to lot number two on Spruce street, there seems to be nothing contained in the case, from which it can be seen to have formed any part of the premises described in the mortgage. The judgment should be modified in the manner already stated, and as so modified, it should be affirmed without costs to either party.

[ERIE GENERAL TERM, February 12, 1866. *Grover, Marvin* and *Daniels,* Justices.]